**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | * | MDL 2179 |
| "Deepwater Horizon" in the Gulf | | |
| of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | JUDGE BARBIER |
| This Document Relates To: | | |
| *All Cases in Pleading Bundle B3* | * | MAG. JUDGE CURRAULT |

---

| | | |
|---|---|---|
| JESSICA ANN-MARIE CLARK and | * | |
| ROBERT NICHOLAS CLARK II, | | |
| Individually and as Parents on Behalf of | * | |
| G.C., a Minor Child, | | |
| | * | |
| PLAINTIFFS, | | |
| | * | |
| VERSUS | | CIVIL ACTION NO. |
| | * | |
| BP EXPLORATION & PRODUCTION, | | JUDGE BARBIER |
| INC., a Delaware Corporation, | * | |
| BP AMERICA PRODUCTION CO., | | MAG. JUDGE CURRAULT |
| a Delaware Corporation, | * | |
| TRANSOCEAN HOLDINGS, LLC, | | JURY TRIAL DEMAND |
| a Delaware Corporation, | * | |
| TRANSOCEAN DEEPWATER, INC., | | |
| a Delaware Corporation, | * | |
| TRANSOCEAN OFFSHORE | | |
| DEEPWATER DRILLING, INC., | * | |
| a Delaware Corporation, | | |
| HALLIBURTON ENERGY SERVICES, | * | |
| INC., a Delaware Corporation, | | |
| | * | |
| DEFENDANTS. | | |
| | * | |

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, JESSICA ANN-MARIE CLARK, Individually on her own Behalf as a Parent,

and ROBERT NICHOLAS CLARK II, Individually on his own Behalf as a Parent, and as Parents

on Behalf of G.C., a Minor Child (collectively "Plaintiffs"), by and through undersigned counsel, hereby bring this action against BP EXPLORATION & PRODUCTION, INC. ("BP Exploration"), BP AMERICA PRODUCTION COMPANY ("BP America"), TRANSOCEAN HOLDINGS, LLC ("Transocean Holdings"), TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater"), TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. ("Transocean Offshore"), and HALLIBURTON ENERGY SERVICES, INC. ("Halliburton") (collectively "Defendants"), stating as follows:

## INTRODUCTION OF PARTIES

1.      This is an action arising out of injuries, endured by G.C., a Minor ("Child Plaintiff") during his life, subsequently causing permanent injuries, resulting from exposure as a newborn, infant, and child to oil, other hydrocarbons, dispersants, pollutants, and other Toxic Substances due to the *Deepwater Horizon* Oil Spill, which occurred on or about April 20, 2010 ("Oil Spill").

2.      At all times relevant to this action, Plaintiffs JESSICA ANN-MARIE CLARK ("Mother of Child Plaintiff") and ROBERT NICHOLAS CLARK II ("Father of Child Plaintiff") (collectively "Parents of Minor Child" or "Parents of Child Plaintiff") are individuals residing in Harrison County, Mississippi, and are *sui juris*.

3.      At all times relevant to this action, Child Plaintiff was a citizen and resident of Harrison County, Mississippi, and is currently a Minor residing in Harrison County, Mississippi.

4.      Child Plaintiff brings this action by and through undersigned counsel and alongside his Parents who bring this action on his behalf.

5.      Plaintiffs bring this action as individuals seeking relief for Child Plaintiff, and for each Plaintiff respectively for his or her own losses as a Parent of Child Plaintiff.

***BP Defendants***

6.      Defendants BP EXPLORATION & PRODUCTION, INC. ("BP Exploration"), and

BP AMERICA PRODUCTION COMPANY ("BP America") (collectively "BP Defendants") are

Delaware corporations with its principal place(s) of business in Houston, Texas.

7.      BP Exploration was a leaseholder and performed oil exploration, drilling, and

production-related operations, including the Mississippi Canyon Block 252 in the Gulf of Mexico

("Macondo Well" or "Well") where the Oil Spill originated.

8.      The United States Coast Guard designated BP Exploration as a "Responsible Party"

of the Oil Spill.[1]

9.      This Court has personal jurisdiction over BP Exploration because it is registered to

do business in Louisiana, it does business in Louisiana, and with a registered agent in Louisiana.

10.     At all times relevant to this action, BP Exploration purposely availed itself of this

Court's personal jurisdiction by performing various acts related to the Oil Spill including:

  i.    Managing Clean-Up and/or Response Activities in and/or around the waters,
        shores, coastlines, and air of Alabama, Louisiana, Mississippi, Florida, and
        Texas (collectively "Gulf States");

 ii.    Pumping crude oil during the Oil Spill, which polluted the coasts of the Gulf
        States and surrounding environment(s);

iii.    Directing Unified Command, which contracted with various Clean-Up
        Response Companies throughout the Gulf States;

 iv.    Participating with Unified Command, which contracted with various Clean-
        Up Response Companies throughout the Gulf States; and

---

[1] *See* Case No.: 2:10-md-02179-CJB-SS, Rec. Doc. 1805-1.

     v.   Engaging in commerce by purchasing, distributing, and supplying goods and services, including petroleum products, dispersants, as well as other supplies and services for various Clean-Up Response Activities.

11.     BP America was a party to the drilling contract with Transocean Holdings, LLC ("Transocean Holdings") for the drilling of the Macondo Well ("Well").

12.     The United States Coast Guard designated BP America as a "Responsible Party" of the Oil Spill.[2]

13.     At all times relevant to this action, BP America purposely availed itself of this Court's personal jurisdiction by performing various acts related to the Oil Spill including:

     i.   Managing Clean-Up and/or Response Activities in and/or around the waters, shores, coastlines, and air of Alabama, Louisiana, Mississippi, Florida, and Texas (collectively "Gulf States");

    ii.   Pumping crude oil during the Oil Spill, which polluted the coasts of the Gulf States and surrounding environment(s);

   iii.   Directing Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

   iv.   Participating with Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

    v.   Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf Residents, which included petroleum products, dispersants, as well as other supplies and services for various Response Activities; and

---

[2] *Id.*

vi.   Maintaining a presence in the Gulf States by registering to do business in Louisiana, doing business in Louisiana, maintaining a registered agent in Louisiana, with its principal place of business in Texas.

***Transocean Defendants***

14.   Defendants TRANSOCEAN HOLDINGS, LLC, TRANSOCEAN DEEPWATER, INC., and TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. (collectively "Transocean Defendants" or "Transocean") are Delaware corporations with its principal place(s) of business in Houston, Texas.

15.   At all times relevant to this action, Transocean purposely availed itself of this Court's personal jurisdiction by performing various acts related to the Oil Spill, including:

i.   Engaging in Clean-Up and/or Response Activities in or around the Gulf States;

ii.   Manning and guiding the Deepwater Horizon Rig ("DHR"), which exploded while pumping crude oil, resulting in the mass discharge and prolonged seepage of crude oil throughout the Gulf States;

iii.   Directing Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

iv.   Participating with Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

v.   Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf Residents, which included petroleum products, dispersants, as well as other supplies and services necessary for various Response Activities; and

vi. Maintaining a presence in the Gulf States by registering to do business in Louisiana, doing business in Louisiana, maintaining a registered agent in Louisiana, with its principal place of business in Texas.

### *Halliburton*

16. Defendant HALLIBURTON ENERGY SERVICES, INC. ("Defendant Halliburton") is a Delaware corporation with its principal place of business in Houston, Texas.

17. Sperry Drilling Services ("Sperry"), a former division of Defendant Halliburton, was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools. Sperry mudlogging personnel were jointly responsible for monitoring the Well, including mud pit fluid levels, mud flow in and out of the Well, mud gas levels, and pressure fluctuations.

18. At all times relevant hereto, Halliburton Energy Services, Inc., and its Sperry division (collectively "Halliburton") purposely availed itself of this Court's personal jurisdiction by performing various acts related to the Oil Spill including:

i. Responsibility for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well;

ii. At and before the time of the blowout, engaging in Cementing Operations to isolate the hydrocarbon reservoirs and seal the bottom of the Well against the influx of hydrocarbons, such as gas and oil; and

iii. Maintaining a presence in the Gulf States by registering to do business in Louisiana, doing business in Louisiana, maintaining a registered agent in Louisiana, with its principal place of business in Texas.

6

## JURISDICTION AND VENUE

19.     This action is in excess of $75,000, exclusive of interest, costs, and attorney's fees.

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists among the parties.

21.     Alternatively, this Court has subject matter jurisdiction pursuant to 43 U.S.C. § 1349(b)(1), which provides that "[t]he district courts of the United States shall have jurisdiction of cases and controversies arising out of . . . (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals . . .."[3]

22.     Furthermore, in the event this Court lacks jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) and/or 43 U.S.C. § 1349(b)(1),  this Court has jurisdiction pursuant to 28 U.S.C. § 1333 and the Admiralty Extension Act, which extends admiralty and maritime jurisdiction of the United States to "[c]ases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."[4]

23.     The causes of action in this Complaint arise under the general maritime laws of the United States and/or the laws of Mississippi pursuant to U.S.C. § 1367(a).[5]

24.     The Southern District of Mississippi is the proper venue, pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Southern District of Mississippi, Plaintiffs reside in the Southern District of Mississippi, and Child Plaintiff's exposure, permanent injures, as well as treatment for those injuries occurred in the Southern District of Mississippi.

---

[3] *See* 43 U.S.C. § 1349(b)(1)
[4] *See* 46 U.S.C. § 30101(a)
[5] *See* 28 U.S.C. § 1367(a) - (e)

25.     Additionally, as a part of this Multidistrict Litigation ("MDL") *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, this case is filed in the Eastern District of Louisiana pursuant to this Court's Case Management Order for the B3 Bundle, dated February 23, 2021, providing "if [Plaintiff] timely complies with PTOs 63, 66, and 68, then the Judge will . . . either transfer or re-allot it per the parties' stipulation."[6]

26.     All conditions precedent to the institution of this action have been satisfied or otherwise excused.

## GENERAL FACTS

27.     All injuries detailed herein arise from the same transaction and/or occurrence relating to the BP Oil Spill, *Deepwater Horizon* Explosion, and subsequent Oil Spill related events and/or Response Activities.

28.     Plaintiffs hereby reference, incorporate, and adopt all findings of fact detailed in *Findings of Fact and Conclusions of Law* ("Phase One Findings").[7]

29.     Specifically, in Phase One, this Court ascertained the facts and considered evidence as to all Defendants' negligence and/or liability surrounding the blowout and explosion of the *Deepwater Horizon* on or about April 20, 2010.[8]

30.     After hearing the evidence, this Court found that all Defendants were each liable under general maritime law for the blowout, explosion, and Oil Spill.[9]

31.     This Court further found that BP Defendants acted with gross negligence and willful misconduct; Transocean Defendants' conduct was negligent; and Halliburton's conduct

---

[6] *See* Case No.: 2:10-md-02179-CJB-DPC, Rec. Doc. 26924 (Providing for the original filing in the Eastern District of Louisiana, pursuant to the Case Management Order for the B3 Bundle, dated 02/21/2021) (Upon compliance by Plaintiff(s) with the Pre-Trial Orders for the B3 Bundle, the case can be transferred to another United States District Court for further proceedings by following the requisite procedures).
[7] *See* MDL Case No. 2179, Rec. Doc. 13355, 21 F.Supp.3d 657 (E.D. La. 2014).
[8] *Id*.
[9] *Id*. at 746-47, 757.

was negligent.  Fault was apportioned as follows:  BP Defendants found 67% liable, Transocean Defendants found 30% liable, and Halliburton found 3% liable.[10]

32.     There was a full and fair opportunity to litigate liability, liability was litigated, all Defendants were parties and/or in privity with a party, and resolution of those issues was necessary for this Court to enter the Phase One Findings.

33.     On or about December 9, 1998, predecessors to all BP Defendants and all Transocean Defendants entered a contract for the construction, use, and operation of the *Deepwater Horizon*.

34.     BP Exploration leased the *Deepwater Horizon*, a vessel, to drill exploratory wells at the Macondo Well ("Well") prospect site.  BP's responsibilities, as operator and primary leaseholder, included assessing the geology of the site, engineering the Well design, obtaining regulatory approvals for Well operations, retaining the project's contractors, overseeing the project's contractors, and working on various aspects of the Well and Drilling Operations.

35.     BP America contracted with Transocean Holdings to drill the Macondo Well.

36.     Halliburton manufactured a nitrogen foam cement slurry mixture ("Cement Mixture") to provide cementing and mudlogging services for the *Deepwater Horizon*.

37.     The Oil Spill occurred with the blowout of the Macondo Well, which was drilled by the Deepwater Horizon Rig ("DHR") on the outer continental shelf in the Gulf of Mexico, approximately 130-miles southeast of New Orleans, Louisiana.

38.     The explosions and fire on board the DHR occurred on or about April 20, 2010.

---

[10] *Id*. at 757.

*Deepwater Horizon BP Oil Spill*

39.     On April 20, 2010, workers on the *Deepwater Horizon* Oil Rig lost control of the Macondo Well just after the final cementing work was completed.  During the cementing work, an explosion occurred on the *Deepwater Horizon*, and it caught fire.

40.     The explosion and fire itself caused the deaths of eleven (11) people and at least seventeen (17) others were injured from the immediate April 20, 2010 incident alone.

41.     The explosion(s) and/or fire should have triggered the automatic function on the vessel's Blowout Preventer ("BOP"). The function failed, or the BOP failed to shut in the Well.

42.     The *Deepwater Horizon* was connected to the wellhead at the seafloor by an approximately 5,000-foot pipe called a "riser" and, as the vessel sank, it pulled the riser down with it – bending and breaking the pipe before finally tearing away from it completely.

43.     The riser, bent into a crooked shape underwater, extended approximately 1,500 feet above the seabed, and then buckled back down.  Oil flowed out from the open end of the riser, and through two (2) breaks along its length.

44.     On or about April 22, 2010, the vessel sank to the ocean floor after burning for approximately two (2) days.

45.     Millions of gallons of oil discharged into the Gulf of Mexico over the next 87-days.

46.     Crude oil was discharged before the *Deepwater Horizon* platform sank on or about April 22, 2010. However, the rate of discharge increased even more once the *Deepwater Horizon* sank to the ocean floor.

47.     After the explosion and sinking of the *Deepwater Horizon*, BP Defendants attempted to downplay and/or conceal the severity the BP Oil Spill. Government investigators

found that BP's initial leak-estimate of 1,000 barrels of oil per day was a mere fraction of its measured leakage of approximately 50,000 barrels per day.

48.     Moreover, BP Defendants did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the BP Oil Spill.

49.     On or about April 30, 2010, oil made landfall as the flow of oil continued unabated.

50.     On or about June 20, 2010, Congressman Edward Markey of Massachusetts released an internal BP document showing that BP's own analysis revealed the actual rate of oil leakage to be 4,200,000 gallons per day, and that the total oil leakage could reach 100,000 barrels.

51.     The BP Oil Spill created an oil slick with a range of thousands of miles, with thick voluminous plumes of oil in the deep waters within the Gulf of Mexico.  The Oil Spill caused these slicks and plumes to form.

52.     The oil infiltrated, and continues to infiltrate, the delicate wetlands and intertidal zones that protect the coasts of Louisiana, Mississippi, Alabama, Texas, and Florida.

53.     An estimated 200-million gallons of crude oil infiltrated sensitive coastland and intertidal ecosystems.

54.     On July 15, 2010, after multiple unsuccessful attempts, the Well was finally capped and by mid-September, it was sealed with cement.

55.     After the Oil Spill, the United States Coast Guard formally and/or informally designated, *inter alia*, BP Defendants and Transocean Defendants as "Responsible Parties" under the Oil Pollution Act ("OPA").

56.     Leaked crude oil contains many highly toxic and hazardous chemicals, which can damage nearly every system in the human body.

57.     In the wake of the disaster, and pursuant to its duties and responsibilities under the OPA, BP Defendants began implementing a Response and Containment Plan.

58.     The "BP Oil Spill" includes the events, actions, inactions, and omissions leading up to, during, and after the following:

    i.    The blowout of the Macondo Well, which was drilled on the Outer Continental Shelf in the Gulf of Mexico (occurring approximately 130-miles Southeast of New Orleans, Louisiana);

    ii.   The explosions and fire on board the DHR on or about April 20, 2010;

    iii.  The sinking of the DHR on or about April 22, 2010;

    iv.   The release of oil, other hydrocarbons, pollutants, and other toxic substances from the Macondo Well and/or the DHR and its appurtenances;

    v.    The efforts to contain the Macondo Well; and

    vi.   Response Activities performed by Clean-up Workers and Response Workers under the direction of Unified Command.

59.     BP Defendants were the operators of the Macondo Well under federal regulations of the Minerals Management Service ("MMS"). Therefore, BP Defendants were the lessee(s) designated as having control and/or management of operations.

60.     As operators and primary leaseholders, BP Defendants were responsible for, including, but not limited to – assessing the geology of the site, engineering the Well design, obtaining regulatory approvals for Well Operations, retaining, and overseeing the project-contractors, and working on various aspects of the Well and drilling operations.

*DWH Toxic Chemicals*

61.    For purposes of this action, crude oil, hydrocarbons, benzene, and/or products containing benzene, which are all associated with the Clean-Up Efforts from the Macondo Well and the *Deepwater Horizon* Explosion, are collectively known as "DWH Toxic Chemicals."

62.    After the disaster, BP Defendants began implementing a Disaster Response Plan to prevent oil from escaping the blown-out Well, manually contain the oil, and disperse oil in the water using chemical dispersants.

63.    BP Defendants' Response Plan included the use of chemical dispersants, specifically Corexit, to break down the oil into finely dispersed droplets.

64.    On or about April 23, 2010, immediately after the *Deepwater Horizon* disaster, BP began subsea and aerial application of chemical dispersants to the oil slicks and sheens on the surface of the Gulf of Mexico.

65.    On or about May 19, 2010, the United States Environmental Protection Agency ("EPA") Administrator directed BP Defendants, within 24-hours of issuance, to identify and use chemical dispersants that are less toxic than the Corexit dispersants.

66.    On May 20, 2010, BP Defendants objected to changing dispersants and notified the EPA that it would continue using Corexit.

67.    BP Defendants' use of Corexit skyrocketed in May of 2010.

68.    On May 22, 2010, BP Defendants used 45,000 gallons of Corexit.

69.    On May 23, 2010, BP Defendants used 70,000 gallons of Corexit.

70.    On May 26, 2010, the EPA directed BP Defendants to reduce overall use of Corexit by 75%.  This EPA directive also required BP Defendants to eliminate use of chemical dispersants

13

on the surface, except in rare cases where an exemption is sought in writing from the United States Coast Guard Federal On-Scene Coordinator in charge of the Response Efforts.

71.     Since the May 26, 2010 EPA directive, BP Defendants sought more than forty (40) exemption requests to use chemical dispersants on the surface and subsea in the Gulf of Mexico.

72.     The dispersant-treated and raw crude oil carried significant public health risks because it contained highly toxic chemicals, which can damage various systems in the body.

73.     Specifically, crude oil contains benzene and other Volatile Organic Compounds ("VOCs") such as ethylbenzene, toluene, xylene, naphthalene, Polycyclic Aromatic Hydrocarbons ("PAHs"), diesel fumes, and heavy metals such as aluminum, cadmium, nickel, lead, and zinc.

74.     These compounds can cause severe harm to human and reproductive health.

75.     Chemicals such as benzene, PAHs, VOCs, and other chemicals in crude oil are toxic and move from the oil into the air.

76.     Once airborne, these chemicals and fugitive emissions, with pungent petroleum-like odors, can blow over the ocean for hundreds of miles, reaching communities far from the location of the Oil Spill.

77.     According to the Agency for Toxic Substances and Disease Registry, which is part of the United States Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

78.     A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in lymphocytes

and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and cancer.

79.     As a result of the explosion of the DHR, DWH Toxic Chemicals and many highly toxic dispersants were released from the Macondo Well and reached the shores of the Gulf States.

*Toxic Dispersants*

80.     Aside from DWH Toxic Chemicals, BP Defendants purchased highly noxious chemical dispersants from Nalco, a chemical manufacturer, and/or its subsidiaries and sprayed them as part of the Response Activities performed in the Clean-Up Efforts.  These dispersants manufactured by Nalco include Corexit EC9500A and Corexit EC9527A.

81.     Corexit products contain hazardous substances, harmful to human health, and dermal exposure, inhalation, and ingestion should be avoided.

82.     Corexit EC9500 is an eye and skin irritant and can irritate the respiratory tract if inhaled, for example, it can cause chemical pneumonia.

83.     Corexit EC9527A contains 2-butoxyethanol, ("EGBE").  Repeated or excessive exposure to EGBE can cause injury to red blood cells, the kidneys, and the liver.  EGBE can be carcinogenic to humans.  It is an eye, nose, and throat irritant that causes nausea, vomiting, diarrhea, and abdominal pain.  Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness.

84.     These harmful dispersants, Corexit EC9500A and Corexit EC9527A, are hereinafter collectively referred to as "Toxic Dispersants."

85.     On or about April 23, 2010, BP Defendants and/or BP Defendants' agents began applying Toxic Dispersants to the oil on the surface of the Gulf of Mexico. BP Defendants sprayed

Toxic Dispersants onto the ocean surface from aircrafts, which flew over areas with oil and dispensed chemicals from cargo holds, fountain type jets on the decks of boats, and smaller vessels onto the surface of the water. BP Defendants also injected Toxic Dispersants immediately below the surface of the water from vessels, deep below the surface of the ocean, and even sprayed by hand. BP Defendants sprayed these Toxic Dispersants throughout the day and night, exposing anyone near the coastal areas, despite warnings not to.

86.     According to the *BP Deepwater Horizon Gulf Study*, which was based on the health effects of Zone Residents and Clean-Up Workers around the BP Oil Spill, the toxic effects on the human body are 52-times more toxic when Corexit and crude oil are combined.

87.     The *BP Deepwater Horizon Gulf Study*, funded by BP Defendants themselves, showed how upstream petrochemical workers have experienced leukemia, multiple myeloma, melanoma, and esophageal adenocarcinoma.

88.     BP Defendants used dispersants known to cause, *inter alia*:  headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of Chronic Obstructive Pulmonary Disease ("COPD").

89.     BP Defendants and its contractors have used more than 1.8 million gallons of toxic dispersants in the Gulf of Mexico in connection with the Oil Spill.

*Minor Child's Exposure*

90.     During approximately April through August of 2010, as a newborn, then as an infant, and thereafter through 2011, Child Plaintiff was exposed to oil, chemicals, dispersants, pollutants, PAHs, VOCs, other hydrocarbons, and other substances (collectively "Defendants' Substances") in and around Harrison County, Mississippi.

91.     Specifically, Child Plaintiff was exposed to Defendants' Substances every single evening when his Father would return home from Clean-Up Work and hold the newborn child.

92.     Child Plaintiff's Father would drive home from his Clean-Up Work and immediately hold his newborn son for hours while in the same clothing from each day he returned home from his Clean-Up Work at least five (5) days a week after working at least 12-hour shifts.

93.     Child Plaintiff's Father's clothes were saturated in Defendants' Substances daily.

94.     After dinner, Child Plaintiff's Father would fall asleep with newborn Child Plaintiff on his chest for several hours every single night.

95.     Mother of Child Plaintiff would wash the newborn's clothes together with Father of Child Plaintiff's clothes, which still smelled of substances before washed together.

96.     Beginning in approximately April of 2010, Child Plaintiff was exposed via dermal, ingestion, inhalation, and direct contact to Defendants' Substances.

97.     At all relevant times, Plaintiffs were completely unaware of Defendants' wrongful conduct, remaining uninformed of the dangers and hazards related to Child Plaintiff's exposure.

98.     Child Plaintiff's Father never received warnings as a Clean-Up Worker to change his clothes immediately upon returning home without touching his family, which should have been warning(s) provided to Response Workers to protect their families at home.

99.    Child Plaintiff's Father never received any warnings about washing the Clean-Up Worker clothes separate from the family's clothing.

100.    Child Plaintiff frequented beaches and waters in and around the Gulf throughout 2010, 2011, and thereafter.

101.    Plaintiffs, at the time of the Oil Spill, believed that BP as a corporation, would not inform the public that the beaches were safe if the beaches were unsafe.

102.    Further, at the time of the Oil Spill and during the Response Activities, misleading information caused the belief that exposure to oil and/or dispersants was *safe*.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE
### (Against All Defendants)

103.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 102.

104.    At all times relevant to this action, Defendants participated in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

105.    Defendants owed duties of ordinary and reasonable care to Plaintiffs in connection with the Drilling Operations of the *Deepwater Horizon* and maintenance of the vessel, its appurtenances, and equipment.

106.    Defendants owed duties of ordinary and reasonable care to Plaintiffs to guard against and/or prevent the risk of the Oil Spill and its subsequent Clean-Up and Response.

107.    Defendants owed a duty to warn Plaintiffs of non-obvious dangers, such as chemical dispersants and Defendants' Substances infiltrating beaches, marine animals, drinking water, intercoastal waterways, tributaries, seafood, and other areas along the greater Gulf Coast.

108.    Defendants further owed duties to those who might foreseeably be harmed, including Plaintiffs, and to exercise due care in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures.

109.    At all times material to this action, Defendants breached duties of ordinary and reasonable care to Plaintiffs in connection with the Drilling Operations of the *Deepwater Horizon* and maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Oil Spill.

110.    Additionally, Defendants breached a duty to Plaintiffs, including persons who might foreseeably be harmed, to exercise due care in the planning, operation, maintenance, handling, design, implementation, and execution of the Oil Spill Relief and Recovery Measures.

111.    Defendants failed to warn and/or provide sufficient warnings to Plaintiffs of the non-obvious dangers and heightened risks associated with the Oil Spill and subsequent Clean-Up, such as chemical dispersants and Defendants' Substances infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and/or other areas along the greater Gulf Coast.

112.    Furthermore, Defendants knew or should have known that:

    i.  Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

    ii.  Toxic Dispersants used contain hazardous chemicals that are deleterious to human health and the environment;

    iii.  Individuals, such as Plaintiffs, required information from Defendants to become aware of the non-obvious dangers of the harmful effects of crude oil and/or chemical dispersants and/or combination thereof;

iv.   Individuals, such as Plaintiffs, were misinformed about the need to stay away from the hazard infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and other areas along the greater Gulf Coast when in proximity to crude oil and/or chemical dispersants;

v.   Individuals, such as Plaintiffs, believed that profitable corporations such as Defendants would have invested resources in warning the public of the hazard if health and safety posed a risk at the time of the Oil Spill; and

vi.   Failure to invest resources to properly inform families of the hazard at the time of the Oil Spill, due to conflicting messages at the governmental level from tourism concerns and other public interests separate from private entities and/or corporation(s), leads to childhood health hazards.

113.   It is undisputed that the blowout and explosions on the *Deepwater Horizon*, its sinking, the resulting Oil Spill, and Response Activities were caused by the joint and concurrent negligence of all Defendants.

114.   On September 4, 2014, this Court issued *Findings of Facts and Conclusions of Law* holding that BP Defendants' conduct was reckless, Transocean Defendants' conduct was negligent, Halliburton's conduct was negligent, and that each were liable under general maritime law for the blowout, explosion, and subsequent Oil Spill from the *Deepwater Horizon Incident*.[11]

115.   Damages sustained by Plaintiffs as a result of the Oil Spill are apportioned as follows as to liability:  BP Defendants 67%, Transocean Defendants 30%, and Halliburton 3%.

116.   In addition to this Court's findings, Defendants breached duties by:

---

[11] *See In re Oil Spill*, 21 F.Supp.3d 657, 757 (E.D. La. 2014).

i.   Failing to warn Plaintiffs of the harmful effects of toxic and chemical dispersants, including benzene, PAHs, VOCs, and other hazardous substances coming into contact with Plaintiffs;

ii.   Failing to properly warn Plaintiffs to avoid exposure to hazardous substances encountered in connection with the Oil Spill;

iii.   Failing to maintain, monitor, and operate the *Deepwater Horizon* in a reasonably safe manner so as to avoid harm to foreseeable individuals, such as Plaintiffs harmed from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure;

iv.   Failing to inspect the BOP to ensure it was not faulty and/or would not fail during use to avoid harm to foreseeable individuals, such as Plaintiffs harmed from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure; and/or

v.   Failing to otherwise exercise reasonable care in the planning, operation, maintenance, handling, design, implementation, and/or execution of the Clean-Up and Response Activities with recovery measures to avoid harm to foreseeable individuals, such as Plaintiffs.

117.   Child Plaintiff was exposed and came into contact with oil, other hydrocarbons, chemical dispersants, and/or other substances through the eyes, nose, mouth, skin, and/or airways via inhalation, ingestion, dermal, and direct contact.

118.   As a direct and proximate cause of Defendants' negligence, Child Plaintiff was exposed to chemical dispersants, oil, toxins, and/or other substances and suffered significant injuries, including Leukemia (Blood Cancer), and continues to suffer significant injuries including,

21

but not limited to Pseudotumor Cerebri, Leukoencephalopathy, seizures, cognitive and behavioral changes, as well as ADHD, and suffers physical pain, mental anguish, loss of enjoyment of life, loss of future earning capacity, disability, disfigurement, incurred medical and travel expenses in the care and treatment of his injuries, including cognitive and behavioral changes, which were foreseeable, natural, and probable consequences of Defendants' negligence.

119.    As a direct and proximate cause of Defendants' negligence, Child Plaintiff suffered through several agonizing years of intense pediatric cancer treatment, traveled back-and-forth for medical care, lost precious years of his childhood because of his conditions, and fought for his life with bravery for years. After fighting cancer, Child Plaintiff continues to endure permanent injuries that he must live with for the rest of his life as a result of Defendants' negligence.

120.    As a direct and proximate cause of Defendants' negligence, Child Plaintiff's Parents must continue to tend to Child Plaintiff's extensive medical needs.

WHEREFORE, Plaintiffs hereby demand judgment against all Defendants as follows:

  i.  Past and future medical expenses;

  ii.  Past and future travel expenses for medical care and other treatment;

  iii.  Compensatory damages;

  iv.  Loss of consortium;

  v.  Loss of enjoyment of a healthy child, emotional losses, pain, and suffering;

  vi.  Pain and suffering, past, present, and future;

  vii.  Punitive damages;

  viii.  Pre-judgment and post-judgment interest;

  ix.  Any and all supplemental Mississippi remedies available to Plaintiffs; and

  x.  Any other relief this Court deems just and proper.

## COUNT II – GROSS NEGLIGENCE
### (Against BP Defendants)

121.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 120.

122.    BP Defendants owed duties of ordinary and reasonable care to Plaintiffs in connection with the Drilling Operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances, and equipment.

123.    BP Defendants also owed duties of ordinary and reasonable care to Plaintiffs to guard against and/or prevent the risk of the Oil Spill.

124.    BP Defendants owed a duty to warn Plaintiffs of non-obvious dangers, such as chemical dispersants and Defendants' Substances infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and/or other areas along the greater Gulf Coast.

125.    BP Defendants further owed duties to those who might foreseeably be harmed, including Plaintiffs, to exercise due care in the planning, operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures.

126.    Furthermore, BP Defendants knew or should have known that:

    i.   Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

    ii.   The toxic and chemical dispersants used contain hazardous chemicals, which are deleterious to human health and the environment;

    iii.   Plaintiffs expected a multi-billion-dollar corporation to make the public, consumers, and Parents aware of the non-obvious dangers of the harmful effects of crude oil and/or chemical dispersants;

iv.   Failing to warn Plaintiffs of the harmful effects caused by coming into contact with Defendants' Substances from exposure to benzene, PAHs, VOCs, and other hazardous substances would result in harm;

v.   Failing to properly warn Plaintiffs to avoid exposure to hazardous substances encountered in connection with the Oil Spill was detrimental to human health;

vi.   Failing to maintain, monitor, and operate the *Deepwater Horizon* in a reasonably safe manner so as to avoid harm to foreseeable individuals, such as Plaintiffs, causing reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure;

vii.   Failing to inspect the BOP to ensure it was not faulty and/or would not fail during use would cause harm to foreseeable individuals, such as Plaintiffs harmed from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure; and/or

viii.   Failing to otherwise exercise reasonable care in the planning, operation, maintenance, handling, design, implementation, and/or execution of the Clean-Up and Response Activities with recovery measures was necessary to avoid harm to foreseeable individuals, such as Plaintiffs.

127.   BP Defendants additionally focused primarily on profit and image while recklessly disregarding the health of the public, as well as the health and safety of the surrounding environment(s) while undertaking ultra-hazardous activities on the *Deepwater Horizon*.

128.   BP Defendants' conduct was reckless and/or willful and wanton, which completely disregarded the safety of children and families in the Gulf States, such as Plaintiffs, by:

i.  Performing a critical well pressure test using untrained, unqualified personnel, and ignoring and/or misinterpreting abnormal "red flag" pressure test results;

ii.  Using a Well design with too few barriers to gas flow;

iii.  Failing to use a sufficient number of centralizers to prevent channeling during the cement process;

iv.  Failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

v.  Failing to run a cement bond log to evaluate the integrity of the cement job;

vi.  Failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the Well;

vii.  Using an untested, abnormally large volume of mixed spacer solutions to avoid properly disposing of the two-separate spacer substances as hazardous waste;

viii.  Grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant;

ix.  Failing to ensure containment of oil expeditiously and adequately, and within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

x.  Failing to ensure that adequate safeguards, protocols, procedures, and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled Oil Spill;

xi.  Failing to warn the public, such as Plaintiffs, of harmful health effects of the DWH Toxic Chemicals and Toxic Dispersants;

xii.  Failing to warn the public, such as Plaintiffs, of harmful health effects from exposure to these substances;

25

xiii.   Failing to warn the public, such as Plaintiffs, of the need to use proper protective clothing and respirators when in close proximity to the areas affected by the Oil Spill;

xiv.   Failing to warn the public, such as Plaintiffs, of the need to remain away from the beaches despite conflicting information from sources separate from the corporation primarily responsible for the Oil Spill;

xv.   Failing to use reasonably safe dispersant chemicals in attempt to respond to the Oil Spill;

xvi.   Willfully using Corexit despite the EPA issuing directives for BP Defendants to use lesser toxic dispersants than Corexit; and/or

xvii.   Willfully failing to comply with and/or ignoring EPA directives to reduce the use of surface and subsurface dispersants.

129.   Child Plaintiff was exposed to and encountered oil, other hydrocarbons, chemical dispersants, and/or other substances through the eyes, nose, mouth, skin, and airways via dermal, ingestion, inhalation, and/or direct contact.

130.   BP Defendants' conduct was reckless and/or willful and wanton.

131.   BP Defendants knew or should have known that such reckless and/or willful and wanton conduct would foreseeably cause Child Plaintiff's injuries.

132.   As a direct and proximate cause of BP Defendants' reckless and/or willful and wanton acts, Child Plaintiff was exposed to Defendants' Substances, including chemical dispersants and/or other toxins, he suffered, and continues to suffer significant injuries including Leukemia (Blood Cancer), and suffers physical pain, mental anguish, loss of enjoyment of life, loss of future work, disability, disfigurement, incurred medical and travel expenses in the care and

treatment of his injuries, and physical handicap with his ability to take care of himself and his family impaired. As a direct and proximate cause of Defendants' negligence, Child Plaintiff suffers from other serious injuries, including, but not limited to cognitive and behavioral changes, Pseudotumor Cerebri, Leukoencephalopathy, seizures, as well as ADHD, and other complications, which were foreseeable, natural, and probable consequences of Defendants' negligence.

133.    These injuries Child Plaintiff endured, and losses to his Parents, were foreseeable, natural, and probable consequences of BP Defendants' reckless and/or willful and wanton conduct, which led to the Oil Spill and subsequent Response Activities that exposed Child Plaintiff to harmful substances causing his terminal illness and permanent injuries.

134.    As a direct and proximate result of BP Defendants' reckless and/or willful and wanton acts, Child Plaintiff lost and continues to remain deprived of precious moments amounting to years of childhood.

135.    As a direct and proximate result of BP Defendants' reckless and/or willful and wanton acts, Child Plaintiff's Parents will endure the lifelong concern of their child experiencing future illness and/or harm from his permanent injuries.

WHEREFORE, Plaintiffs hereby demand judgment against BP Defendants as follows:

    i.      Past and future medical expenses;

    ii.     Loss of future earning capacity of a child;

    iii.    Lost wages for caring for the child;

    iv.     Pain and suffering during treatment;

    v.      Pain and suffering after treatment;

    vi.     Pain and suffering for the rest of his life;

    vii.    Pain and suffering leading to fear of future illness;

viii.   Loss of consortium;

ix.    Loss of enjoyment of life and of childhood;

x.     Emotional trauma from experiencing the terminal illness of a child;

xi.    Fear of future illness as to his minor-siblings and Parents' other children;

xii.   Fear of future illness and/or condition(s);

xiii.   Punitive damages;

xiv.   Pre-judgment and post-judgment interest;

xv.    Any and all supplemental Mississippi legal remedies available; and

xvi.   Any other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs hereby demand judgment against Defendants as follows:

i.    Past physical pain and suffering, mental pain, anguish, distress, loss of enjoyment of life, and impairment;

ii.   Past medical expenses;

iii.   Future medical expenses;

iv.   Cost of past and future treatment;

v.    Loss of earning capacity of the child;

vi.   Lost earnings of each parent in caring for the child;

vii.   Mental pain, anguish, distress, loss of enjoyment of life, and impairment;

viii.   Recovery of Child Plaintiff's damages resulting from his illness, including, but not limited to damages for loss of love, affection, consortium, society, companionship, care, guidance, and monetary support;

ix.   Punitive and/or exemplary damages;

    x.   Pre-judgment and post-judgment interest;

   xi.   Attorney's fees and costs;

  xii.   Any other relief this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand trial by jury on all issues so triable.

Dated: September 21, 2021

Respectfully Submitted,

**THE DOWNS LAW GROUP, P.A.**
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Telephone: (305) 444-8226
Facsimile: (305) 444-6773

*/s/ Riana Maryanoff*
Riana Maryanoff, Esq.
Florida Bar No.: 1024768
Email: rmaryanoff@downslawgroup.com

*/s/ C. David Durkee*
C. David Durkee, Esq.
Florida Bar No.: 998435
Email: ddurkee@downslawgroup.com

***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been served on Counsel registered to receive electronic service via electronically filing using the CM/ECF System, which will send a notice of electronic filing through the Court's electronic filing system, on this 21<u>st</u> day of <u>September</u> 2021.

<u>/s/ Riana Maryanoff</u>
Riana Maryanoff, Esq.
